*If this opinion indicates that it is "FOR PUBLICATION," it is subject to revision until final publication in the Michigan Appeals Reports.*

# STATE OF MICHIGAN

# COURT OF APPEALS

PEOPLE OF THE STATE OF MICHIGAN,

Plaintiff-Appellee,

UNPUBLISHED
August 25, 2022

v

No. 357202
Oakland Circuit Court
LC No. 16-259142-FC

KEVIN THOMAS MCCOLLUM,

Defendant-Appellant.

Before:  M. J. KELLY, P.J., and MURRAY and BORRELLO, JJ.

PER CURIAM.

In 2017, a jury convicted defendant of three counts of first-degree criminal sexual conduct (CSC-I), MCL 750.520b(1)(a) (sexual penetration of a child under 13 years of age), and the trial court sentenced him to three concurrent terms of 30 to 60 years imprisonment. The trial court denied defendant's motion for a new trial and a *Ginther*[1] hearing on the basis of ineffective assistance of counsel. In a prior appeal, this Court affirmed defendant's convictions but remanded for resentencing. *People v McCollum*, unpublished per curiam opinion of the Court of Appeals, issued May 23, 2019 (Docket No. 337735). After defendant filed an application for leave to appeal in the Supreme Court, that Court, in lieu of granting leave to appeal, vacated in part this Court's opinion and remanded to the trial court for a *Ginther* hearing. *People v McCollum*, 505 Mich 969 (2020). Following the *Ginther* hearing, the trial court denied defendant's motion for a new trial through a detailed written opinion. Thereafter, the court resentenced defendant to three concurrent terms of 25 to 60 years imprisonment. Defendant now appeals as of right, asserting that the trial court erred by denying his motion for a new trial. Because we conclude that trial counsel was ineffective for stipulating to the admission of the victim's CARE House video interview, we reverse defendant's convictions and remand for a new trial.

## I. FACTUAL OVERVIEW

---

[1] *People v Ginther*, 390 Mich 436; 212 NW2d 922 (1973).

-1-

Defendant was convicted of sexually assaulting his stepdaughter, KS, between 2012 and 2016, when she was approximately 7 to 12 years old. In defendant's prior appeal, this Court summarized the underlying facts as follows:

KS's mother began living with defendant when KS was three years old, and they were married sometime thereafter. KS testified that she was about four the first time she remembers defendant touching her inappropriately, and that behavior continued until March 2016, when she was twelve years old. In March 2016, KS told her mother that defendant was touching her inappropriately on her special place. The next day, she told her best friend EP that defendant had sexually abused her since she was little; that defendant tried to pull her pants down, and that he touched her vagina. After school that day, EP told her parents, who called KS's middle school counselor, Ken Dudek, and told him that KS's stepfather was touching her inappropriately. That night, KS's mother required KS to go to the basement with her to confront defendant and tell him to stop. When KS did so, defendant told her that he may have rubbed too low when giving her a stomach or back rub, but he did not think he ever touched her inappropriately. Defendant left the house that night.

The next day, KS was pulled out of class to speak with two counselors— Dudek and a more experienced counselor, Denise Landers. KS told them her stepfather had been touching her inappropriately, after which Dudek left the room. KS told Landers it had been going on since defendant came into her life and responded affirmatively when Landers asked if the touching involved a penis. Landers called Child Protective Services (CPS) and members of the school administration. That afternoon, KS's principal, Dr. Catherine Neuhoff, called KS into her office and asked about what was going on at home. KS began to describe a day when she was home after school taking a nap on the couch and her stepfather started to touch her. Neuhoff subsequently talked to the school's police liaison officer, who called the Troy police.

CPS contacted KS's mother the following afternoon. At some point, KS was taken to CARE House for a medical examination and a forensic interview. During the interview, she mentioned a boy from church who had touched her inappropriately when she was younger. In July 2016, KS was sent to Indiana to live with her biological father and his wife. Detective Kristine Shuler was assigned to the case and interviewed defendant as part of her investigation. In due course, defendant was arrested and criminally charged.

KS turned 13 the day defendant's trial began. She testified that, multiple times when she was watching cartoons in the basement, defendant would come downstairs, take off her clothes, and touch her special place and her chest with his tongue, his finger, and his private part. When he touched her chest, it was the place normally covered by her bra. Sometimes, he took off his clothes. He moved the skin aside to lick her special place. He used his finger like his tongue, sometimes running it up and down where she wipes and sometimes sticking a finger inside her special place. Sometimes he would lick his finger before touching her special place.

He would touch his private part to hers and sometimes try to push it in, but it was too big to fit. Sometimes, he would take her hand, put it on his private part, and have her rub up and down. Sometimes he did more than one of these things at a time. A few times, a white liquid came out of his private part.

KS also testified that, on more than one occasion, defendant would come in to use the bathroom when she was in the shower and still be there when she got out, and he would touch her private part with his finger and sometimes his tongue. Sometimes these things also happened in the living room, in her mom's bed, in her room and her top bunkbed, and in the bathroom. Sometimes it started when she was sleeping. All of these things happened when her mom was asleep or out of the house. Her sister would be either outside or in her own room. Sometimes, defendant asked if she had told anyone and said that this was their little secret.

Additionally, KS testified that she felt weird when defendant touched her inappropriately, she was 'kind of scared of him' because 'he was, like, a lot more stronger than I am and he's bigger than I am.' Sometimes she tried to put her clothes back on and sometimes when she did this, he would stop, but sometimes he would not. Sometimes, she tried to get away, but he held her down by her legs or her arms. At times, she piled things behind her bedroom door to try to protect herself, and sometimes she went into the bathroom and locked the door. She started having periods when she was 11 or 12, and he did not touch her when she was having a period.

Defendant testified that he thought he and KS had a very good relationship. They went to movies, football games, and amusement parks, and she was not skittish around him, although she would not let him brush her hair. She would cuddle up in his arm as they watched movies together, and they played video games. Defendant denied having ever touched KS inappropriately. He said that if she were being defiant, he would spank her on the buttocks once with an open hand. He would rub her belly if she had a stomachache. He may have rubbed too low, by which he meant the underwear line. When she was about four, he stripped her down, put her in the shower, and scrubbed off marks she had made on her legs with markers. He did pick KS up and put her to bed when she fell asleep with her mother on the couch. There were family dynamic issues; KS was upset about moving and about her younger sister getting more attention from defendant than she got. On cross-examination, defendant admitted that he had been alone with KS, including in the bathroom when she was showering behind a clear or opaque shower curtain. He spanked her as recently as one month before she made her allegations. He roughhoused with her, accidentally touching her breasts, and he and KS had seen each other nude.

While there was other testimony at the trial, there were no witnesses to the sexual abuse, nor was there any physical evidence in support of KS's allegations. [*McCollum*, unpub op at 1-3.]

## II. EFFECTIVE ASSISTANCE OF COUNSEL

Defendant argues that he is entitled to a new trial on the basis that he received ineffective assistance of counsel. Although defendant makes numerous arguments on this point of law, we agree with him on one: that counsel was ineffective by agreeing to the admission of the complete Care House video.

We review a trial court's decision on a motion for a new trial for an abuse of discretion. *People v Cress*, 468 Mich 678, 691; 664 NW2d 174 (2003). An argument alleging ineffective assistance of counsel presents a mixed question of law and fact. *People v LeBlanc*, 465 Mich 575, 579; 640 NW2d 246 (2002); *People v Russell*, 297 Mich App 707, 715; 825 NW2d 623 (2012). Questions of law are reviewed de novo, and a trial court's findings of fact are reviewed for clear error. *Id*. "To demonstrate ineffective assistance of counsel, a defendant must show that his or her attorney's performance fell below an objective standard of reasonableness under prevailing professional norms and that this performance caused him or her prejudice." *People v Nix*, 301 Mich App 195, 207; 836 NW2d 224 (2013) (citation omitted). "To demonstrate prejudice, a defendant must show the probability that, but for counsel's errors, the result of the proceedings would have been different." *Id*.

The effective assistance of counsel is presumed, and the burden is on the defendant to establish the contrary. *People v Roscoe*, 303 Mich App 633, 644; 846 NW2d 402 (2014). "Surmounting *Strickland*'s[2] high bar is never an easy task." *Padilla v Kentucky*, 559 US 356, 371; 130 S Ct 1473; 176 L Ed 2d 284 (2010). "Even under *de novo* review, the standard for judging counsel's representation is a most deferential one. Unlike a later reviewing court, the attorney observed the relevant proceedings, knew of materials outside the record, and interacted with the client, with opposing counsel, and with the judge." *Harrington v Richter*, 562 US 86, 105; 131 S Ct 770; 178 L Ed 2d 624 (2011).

"Reviewing courts are not only required to give counsel the benefit of the doubt with this presumption, they are required to 'affirmatively entertain the range of possible' reasons that counsel may have had for proceeding as he or she did." *People v Gioglio (On Remand)*, 296 Mich App 12, 22; 815 NW2d 589 (2012) (citation omitted), vacated in part on other grounds 493 Mich 864 (2012). "[A] reviewing court must conclude that the act or omission of the defendant's trial counsel fell within the range of reasonable professional conduct if, after affirmatively entertaining the range of possible reasons for the act or omission under the facts known to the reviewing court, there might have been a legitimate strategic reason for the act or omission." *Id*. at 22-23. The defendant has the burden of establishing the factual predicate for his assertion of ineffective assistance of counsel. *People v Douglas*, 496 Mich 557, 592; 852 NW2d 587 (2014).

Preliminarily, defendant relies on *Douglas*, 496 Mich at 557, to support his argument that trial counsel was ineffective for stipulating to the admission of the CARE House video interview. In *Douglas*, the statements from the complainant's forensic interview were admitted in evidence, over defense counsel's objections, through the video and the testimony of the interviewer. The interviewer in *Douglas* opined that she believed that the child had not been coached and that the child was being truthful. *Id*. at 570. The issue was presented primarily as a claim of evidentiary error. Accordingly, *Douglas* did not consider whether a defense strategy might focus on the

---

[2] *Strickland v Washington*, 466 US 668; 104 S Ct 2052; 80 L Ed 2d 674 (1984).

introduction of a complainant's out-of-court statements for the purpose of showing that the complainant's trial testimony had been tainted by suggestive questioning and that the allegations had evolved from multiple interviews. But that is what occurred here, as trial counsel explained that he stipulated to the admission of the video as part of a strategy to persuade the jury that KS's trial testimony was unreliable because her allegations against defendant had evolved as a result of multiple interviews with different people, including the CARE House interviewer. Thus, whether trial counsel's decision to stipulate to the admission of the video of the interview was ineffective assistance of counsel requires consideration of counsel's strategy and not just a simple application of *Douglas*.

Decisions regarding what evidence to present are matters of trial strategy, *People v Rockey*, 237 Mich App 74, 76; 601 NW2d 887 (1999), and counsel has wide discretion in matters of trial strategy, *People v Heft*, 299 Mich App 69, 83; 829 NW2d 266 (2012). We will not substitute our judgment for that of counsel regarding matters of trial strategy, nor will we assess counsel's competence with the benefit of hindsight. *People v Rice* (*On Remand*), 235 Mich App 429, 445; 597 NW2d 843 (1999). As the Supreme Court has emphasized, it is "all too tempting" to "second-guess counsel's assistance after conviction or adverse sentence." *Strickland*, 466 US at 689. However, while deference is given to counsel's strategic decisions, "a court cannot insulate the review of counsel's performance by calling it trial strategy; counsel's strategy must be sound, and the decisions as to it objectively reasonable." *People v Ackley*, 497 Mich 381, 388-389; 870 NW2d 858 (2015) (quotation marks and citations omitted).

We agree with defendant that trial counsel's decision to stipulate to the admission of the video interview was not objectively reasonable under the circumstances. In his opening statement, trial counsel informed the jury it would have an opportunity to view the video of KS's interview at CARE House and requested that it pay close attention to suggestive or leading questions, use of "social reinforcements" or social cues, KS's statements about a webcam, and KS's admission that she did not have a good memory. At the *Ginther* hearing, trial counsel explained that the CARE House interview was important to the defense strategy and necessary to support the testimony of a defense expert. However, as trial counsel acknowledged, the expert opined in his report that "much of the child forensic interview was conducted properly" and that the forensic interviewer "generally followed appropriate procedure for such an interaction" and "avoided for the most part leading questions." Counsel also agreed that the defense expert expressed no concern that the interviewer engaged in social reinforcement and acknowledged that before the video was played, KS had already admitted that she did not have a good memory. Trial counsel also acknowledged that KS had testified about the webcam on direct examination and that her mother's trial testimony contradicted her testimony in that regard.

Significantly, even though counsel explained that the thrust of the expert's testimony was not to criticize the CARE House interview but rather to discuss how the number of interviews that KS participated in could affect KS's subsequent statements, he admitted that this could have been accomplished by placing the number of interviews on the record, without admitting the content of the forensic interview itself. Trial counsel acknowledged that he received the expert's report before trial and thus would have known before trial—before playing the video for the jury—that the expert had opined that the forensic interview was not problematic, that the interviewer did not provide additional information to KS, and that KS's allegations were essentially consistent.

Furthermore, although the trial court properly noted certain opinions and arguments that were supported by the admission of the CARE House video, they pale in comparison to the likely harm caused by the jury viewing KS repeat her allegations with demonstrations and without the benefit of cross-examination. By permitting the video to be played for the jury, counsel allowed the jury to hear KS retell her allegations against defendant 18 different times. KS demonstrated or described eight times throughout the interview how defendant touched her, six times she relayed how she tried to escape defendant, and four times about how defendant forced her legs open to sexually assault her. The jury also observed KS demonstrate how defendant held down her legs while he tried to sexually assault her and point out where on her body defendant assaulted her. Thus, counsel exposed defendant to the impact of KS's forensic interview, which, again, the defense expert essentially did not find problematic. Indeed, counsel was aware that there was an inconclusive medical examination, no DNA evidence or eyewitnesses, and that this was essentially a credibility contest between KS and defendant. While *Douglas* is not specifically on point, the Court's observation of the prejudicial impact of the complainant's forensic interview that was played for the jury, in that case, is particularly enlightening. See *Douglas*, 496 Mich at 581-582 ("The video recording of the forensic interview provided further reinforcement still, as the jury was able to watch [the complainant] herself testify again, this time at greater length, with the assistance of [the forensic interviewer's] expert questioning, and not subject to cross-examination, of course.").

For these reasons, trial counsel's decision to stipulate to the CARE House video of KS's forensic interview was not objectively reasonable. We reach this conclusion recognizing the deference due to the trial court's overall decision to deny a new trial and the deference due to strategic decisions made by counsel. We also are cognizant of the fact that defense counsel was well-qualified to handle this case and repeatedly met with his client to assess the limited strategies that existed. And although counsel's overall strategy of not directly attacking KS, but instead attempting to show that KS's allegations were the product of repeated and tainted questioning by multiple interviewers, was not itself unreasonable, admission of the CARE House video was objectively unreasonable as it was not necessary to further this strategy (a fact counsel essentially conceded at the *Ginther* hearing). This is particularly true considering that defendant's expert agreed that the forensic interviewer generally followed appropriate protocols and avoided leading questions during the interview, and had no concerns about the interviewer engaging in social reinforcement. Under these circumstances, admission of the contents of the interview exposed the jury to its prejudicial impact without any reasonable likelihood of it supporting defendant's theory of defense.

For much of the same reasons, there is a reasonable probability that, but for counsel's action, the result of the proceedings, i.e., defendant's convictions, would have been different. Although KS testified to the circumstances of the conduct, the unfiltered video of KS providing detailed answers to direct questioning, without the benefit of cross-examination, could have had a damaging impact on the jury's decision-making. *Id*. Accordingly, defendant is entitled to a new trial on this basis.

Because we have concluded that defendant is entitled to a new trial based upon this ineffective assistance of counsel argument, we need not address his other arguments regarding ineffective assistance of counsel. However, we will address a remaining evidentiary issue, as it may arise on remand.

## III. ADMISSION OF EVIDENCE

Defendant argues that the trial court abused its discretion by admitting, over objection, the "improper credibility vouching testimony" from KS's mother regarding her reason for divorcing defendant, and that trial counsel was ineffective for failing to object to the line of questioning earlier than he did.

We review a trial court's decision to admit or exclude evidence for an abuse of discretion. *People v Thorpe*, 504 Mich 230, 251; 934 NW2d 693 (2019). "The decision to admit evidence is within the trial court's discretion and will not be disturbed unless that decision falls outside the range of principled outcomes." *Id*. at 251-252 (quotation marks and citation omitted.) "A decision on a close evidentiary question ordinarily cannot be an abuse of discretion." *Id*. at 252.

Generally, all relevant evidence is admissible unless otherwise provided for in the court rules or the state or federal constitutions. MRE 402; *People v Yost*, 278 Mich App 341, 355; 749 NW2d 753 (2008). Evidence is relevant if it has "any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence." MRE 401. "A trial court admits relevant evidence to provide the trier of fact with as much useful information as possible." *People v Cameron*, 291 Mich App 599, 612; 806 NW2d 371 (2011). However, even if evidence is relevant, it may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice. MRE 403.

KS's mother testified that she filed for divorce because "[m]y daughter disclosed to me that [defendant] was sexually abusing her." This testimony did not make any fact of consequence more or less probable. A witness's opinion that a person is guilty, standing alone, has no probative value and is, therefore, irrelevant. MRE 402. Further, the reason that the prosecutor argued that the evidence was relevant—because she "is divorcing the man that's been accused of sexually assaulting her daughter"—appears to be KS's mother giving her opinion that defendant is guilty. Stated differently, through her testimony, KS's mother improperly vouched for the credibility of KS's allegations against defendant. "It is generally improper for a witness to comment or provide an opinion on the credibility of another witness, because credibility matters are to be determined by the jury." *People v Dobek*, 274 Mich App 58, 71; 732 NW2d 546 (2007). For these reasons, the trial court abused its discretion when it allowed, over objection, KS's mother to testify regarding her reason for divorcing defendant.

The admissible evidence was sufficiently compelling to render any error in the admission of KS's mother's divorce-related testimony harmless. *People v Lukity*, 460 Mich 484, 495-496; 596 NW2d 607 (1999), citing MCL 769.26. At trial, there was evidence to support the three CSC-I counts on the basis of KS's testimony describing the incidents of sexual assault. Trial counsel challenged KS's mother's alleged reason for filing for divorce by suggesting that her filing was an attempt to increase her chances of retaining her parental rights to KS. On cross-examination, trial counsel first pointed out that KS's mother's divorce lawyer also represented her in "other proceedings," and then elicited from KS's mother that she was "fighting" a petition to terminate her parental rights. Subsequently, trial counsel challenged KS's mother's credibility during closing argument. Given the admissible evidence and trial counsel's argument that KS's mother was not credible, it affirmatively appears that the evidentiary error was harmless.

## IV. CONCLUSION

Defendant established that he was denied the effective assistance of counsel as a result of trial counsel's stipulation to the admission of the CARE House video. He is entitled to a new trial on this basis.

Reversed and remanded for a new trial. We do not retain jurisdiction.

/s/ Michael J. Kelly
/s/ Christopher M. Murray
/s/ Stephen L. Borrello